**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

          Plaintiff,

      v.

EARL D. WARNER,

          Defendant.

Criminal No. 12-0107

ELECTRONICALLY FILED

**MEMORANDUM OPINION AND ORDER OF COURT**

This matter comes before the Court on Defendant, Earl D. Warner's, Motion to Suppress Defendant's Statements.  Doc. No. 44.   Because the written submissions of Defendant and the Government indicated that there were material facts in dispute, this Court held a suppression hearing which began on July 18, 2013 and was concluded on July 19, 2013.  The key issue addressed by the parties was whether, on April 3, 2012, Defendant was in "custody" (and thereby needed to be advised of his *Miranda* rights) or whether he voluntarily provided information to the police officers.  During the two-day hearing the Court heard testimony from: (1) Trooper Troy Owen, (2) Special Agent Thomas Neil Carter, (3) Defendant, and (4) Shirley Warner.  In light of this Court's Findings of Fact and Conclusions of law, set forth below, the Motion to Suppress will be denied.

**I. Findings of Fact**

1.      On April 3, 2012, Trooper Owen, an employee of the Pennsylvania State Police and Special Agent Carter from the FBI interviewed Earl Warner at the Pennsylvania State Police Barracks in Mercer County.

2.      This interview was arranged via a telephone conversation between Trooper Owen and Defendant a few days prior to April 3, 2012.

3.     During the telephone conversation with Defendant, Trooper Owen indicated he wanted to interview Defendant regarding Armando Cruz.  Defendant testified that Trooper Owen initially offered to conduct the April 3, 2012 interview at Defendant's home, but Defendant testified that he did not want a police car out in front of his mother's home, and ultimately it was decided that the interview would take place in the Barracks.

4.     Defendant and Trooper Owen both testified that on April 3, 2012, Defendant arrived at the Barracks around 1 p.m., and was seated in the waiting room of the Barracks when Trooper Owen went to greet him.  Defendant testified that both he and his mother were seated in the waiting room.

5.     Both Defendant and Trooper Owen testified that Trooper Owen escorted Defendant to an office.  Defendant testified that he told Trooper Owen as they were walking to the office that he wanted a lawyer to be present.  Defendant's mother testified that as her son was walking through the waiting room toward Trooper Owen she heard her son ask if he needed an attorney, and she heard Trooper Owen respond in the negative.  Trooper Owen testified that Defendant never asked for an attorney.

6.     The office where Defendant was interviewed measures fifteen and a half feet by ten and a half feet.  The office contained a desk with a computer on it, a chair behind the desk, and a "guest chair" on the opposite side of the desk.  The Court admitted four photographs of the office where Defendant was interviewed.

7.     Special Agent Carter was in the office near the desk when Defendant and Trooper Owen walked in.  Defendant testified that when he walked into the office he immediately saw a whiteboard with his name and Armando Cruz's name above his.  Defendant testified he was shocked to see his name connected to Armando Cruz's name.

8.     Notably, Special Agent Carter had previously interviewed Defendant in his home on February 15, 2012, in connection with the Armando Cruz investigation.  Defendant also testified that this February 15, 2012, interview with Special Agent Carter took place in his home.  When Special Agent Carter learned that Trooper Owen was going to question Defendant on a state investigation, Special Agent Carter asked if could be present for the April 3, 2012, interview.

9.     Trooper Owen explained that if a suspect is under arrest or in custody, they use an interrogation room which has a chain anchored to the wall.  The office where Defendant talked with Trooper Owen and Special Agent Carter contained no device for tethering or chaining.

10.     Trooper Owen testified that Defendant never asked for an attorney's presence or advice from the time he greeted Defendant in the waiting room to the time they arrived at the office where the interview was conducted.

11.     Trooper Owen and Special Agent Carter both independently testified that prior to posing any questions to Defendant about Armando Cruz and the investigation of Mercer County adults sexually abusing children, Defendant was told he was not under arrest, free to leave at any point in time, the office door was only closed for privacy purposes, and that he would be going home

that day.   Defendant concurred that he was told that he was not being arrested that day and that he was free to leave at any time.

12.    Testimony from Defendant and the investigators concurs that when Defendant was asked if he understood what had just been explained to him, Defendant indicated that he understood.

13.    Defendant and the officers' testimony concurs that Special Agent Carter, began by telling Defendant that the interview would pertain to a joint (FBI and Pennsylvania State Police) investigation which was being conducted with regard to the sexual exploitation of minors by Armando Cruz and other individuals.

14.    Defendant testified that he was asked how he first heard of Armando Cruz, and when he provided an answer, Trooper Owen got angry "bounced" his chair off the wall, righted it and stormed out of the office.  Trooper Owen confirmed that he did so as a tactic to get the Defendant to talk more openly with Special Agent Carter.  According to Defendant after Trooper Owen left the room, Special Agent Carter sat in the chair, but did not sit as close to Defendant as Trooper had.

15.    Special Agent Carter specifically told Defendant about the sexual exploitation of minors' investigation, that there were several people "involved," that Armando Cruz had been interviewed with his lawyer and was cooperating in the investigation, and that Defendant's name had been mentioned as someone who took naked photographs of children.  Defendant was told that Armando Cruz had provided the information about Defendant after he was arrested by the authorities.

16.    In response to Special Agent Carter's statement, both Agent Carter and Trooper Owen indicated that Defendant denied taking any such pictures, and both officers testified that he did not ask for an attorney, nor did he ask to leave.

17.    Special Agent Carter then showed Defendant a segment of a video, and asked Defendant if it was his voice that could be heard on the segment of the video which was shown.

18    In response to Agent Carter's question about the voice on the video, both Agent Carter and Trooper Owen indicated that Defendant did not ask for a lawyer nor to leave.  Instead, he answered the question of his own free will.

19.    Next, Agent Carter showed Defendant photographs and asked Defendant who took the each of the photos and where the photo was taken.

20.    In response to Agent Carter's questions, both Agent Carter and Trooper Owen indicated that Defendant did not ask for a lawyer or to leave.  Instead, he answered the questions of his own free will.

21.    Conversely, Defendant testified that he "stood up" two times while being interviewed in the office.  He stated that the first time was when Trooper Owen bounced the chair off the wall and that startled Defendant.  The second time occurred after Trooper Owen returned to the room

and called Defendant a liar. Defendant testified that he then got up out of his chair and attempted to leave the office but Trooper Owen blocked him, physically, from doing so. In addition, Defendant testified that requested an attorney twice during the interview. The first time was after the chair-bouncing incident, and the second time was right after Trooper Owen allegedly called him a liar.

22.     Defendant and both investigators testified that after being in the office for nearly an hour, Defendant told Special Agent Carter and Trooper Owen that he had answered enough questions and wanted to leave. The two investigators stopped asking questions and Defendant walked out of the office and left the Barracks.

23.     Based on the above summarized testimony, and after observing the four witnesses' appearances, behavior, and manner while testifying, as well as considering their relationships to one another, and their motives and biases, the Court finds that the accounts of Trooper Owen, a state trooper of eight years, and Special Agent Carter, an agent of the FBI for twenty-two years, to be more credible than Defendant's with respect to what occurred inside the Barracks and the office on April 3, 2012.

24.     The Court finds that Defendant did not request an attorney during his encounter with Trooper Owen and Special Agent Carter on April 3, 2012.


## II. Conclusions of Law

1.      Under *Miranda v. Arizona*, 384 U.S. 436, 473-75 (1966), the Government bears the burden of establishing by a preponderance of the evidence that a defendant has voluntarily, knowingly, and intelligently waived his constitutional rights. The Fifth Amendment of the United States Constitution establishes a defendant's right to not self-incriminate.

2.      *Miranda* warnings are required only when a person is in custody and when an officer is conducting a "custodial interrogation." *Miranda,* 384 U.S. at 444. A person is deemed to be in custody when he has been deprived of his freedom of action in any significant way. *Id*.

3.      Whether a suspect is "in custody" for *Miranda* purposes is an objective determination involving two discrete inquires: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted).

4.      A Court must "examine all of the circumstances surrounding the interrogation," *Stansbury v. California*, 511 U.S. 318, 322 (1994), including those that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," *id*., at 325. On the other hand, the "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. *Id.*, at 323. The test, in other words, involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning.

*Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004). The benefit of the objective custody analysis is that it is "designed to give clear guidance to the police." *Id.* at 668.

5.      Police must make in-the-moment judgments as to when to administer *Miranda* warnings. By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind. *J.D.B. v. North Carolina,* 131 S.Ct. 2394, 2403 (2011).

6.      Turning to the facts presented in this case, Trooper Owen and Special Agent Carter testified that they told Defendant he was free to leave anytime and that he was not under arrest. He was taken to an office, not an interrogation room. Defendant's own testimony corroborates this. In addition, Defendant's testimony concurs with the authorities' testimony that he was only in the office for about an hour.

7.      Based in part on the testimony of the two officers indicating they told Defendant he was free to leave anytime, the corroborating testimony of Defendant that he was told he was free to leave, as well as the photographs of the office in the Barracks where the interview took place, the Court finds that Defendant could have stopped the interview at any time, and he even could have turned and left the office before the interview officially began once he saw his name connected to Cruz's name in the whiteboard as he entered the office.

8.      Given the totality of the circumstances present here, and the credibility determinations set forth in the Court's findings of fact, above, the Court concludes that a reasonable person in the suspect's position would understand he was free to terminate questioning.

9.      Accordingly, the Court concludes that Defendant was not "in custody" when he was questioned by Trooper Owen and Special Agent Carter. Therefore, *Miranda* warnings were not required.

### III.      Conclusion

Defendant's Motion to Suppress will be denied. An appropriate Order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

**ORDER**

**AND NOW** this 24th day of October, 2013, upon consideration of Defendant's Motion to Suppress Defendant's Statements (doc. no. 44), the Government's Response (doc. no. 47), and the evidence presented at the suppression hearing held on July 18 and 19, 2013, this Court hereby **DENIES** the Motion to Suppress Defendant's Statements.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge


cc:     All Registered ECF Counsel and Parties